170 So.2d 41 (1964)
Russell MOBLEY, Petitioner,
v.
JACK & SON PLUMBING and the Florida Industrial Commission, Respondents.
Jacob and Antonet MILAVIC (Jack & Son Plumbing) and American Fire and Casualty Company, Cross-Petitioners,
v.
Russell MOBLEY and Florida Industrial Commission, Cross-Respondents.
Nos. 33118, 33170.
Supreme Court of Florida.
November 4, 1964.
Rehearing Denied December 18, 1964.
*43 Samuel Sheradsky, Miami, for petitioner and cross-respondent.
Edwin H. Underwood, Jr., Gerald T. Nolan and Wakefield & Underwood, Miami, for cross-petitioners and respondents.
Patrick H. Mears, Tallahassee, and J. Franklin Garner, Lakeland, for Florida Industrial Commission.
O'CONNELL, Justice.
We have here for our consideration a petition and cross-petition for certiorari, both seeking review of an order of the Florida Industrial Commission that reversed in part, and affirmed in part, an order of the deputy commissioner awarding workmen's compensation benefits to the claimant.
On June 1, 1960, petitioner-claimant, Russell Mobley, while employed as a journeyman plumber for Jack & Son Plumbing, sustained a compensable injury to his right elbow. The injury resulted in a condition diagnosed as "lateral epicondylitis" of the right elbow. That is to say, an inflammation of the knuckle-shaped expansion of the end of the humerus (the bone of the upper arm). Schmidt, Attorneys' Dictionary of Medicine 272 (1962).
Claimant was furnished medical and surgical treatment by the carrier, and, beginning June 15, 1962, he was paid compensation for 10% permanent-partial disability of the right upper extremity on the basis of a scheduled injury. Thereafter, on July 2, 1962, claimant filed a claim for additional benefits.
The deputy commissioner found as a matter of fact that the claimant, in addition to suffering from "chronic and recurrent lateral epicondylitis," suffered from pain that extended into the "lateral and posterior shoulder areas of the right upper extremity and right shoulder, and down into the right hand." On the basis of the shoulder involvement, the deputy abandoned the theory of scheduled injury, and entered a compensation order awarding claimant 30% permanent-partial disability of the body as a whole.
On application for review, the Full Commission reversed the deputy saying that the "only competent substantial evidence according with logic and reason shows that such injury is confined to the scheduled member." The cause was remanded to the deputy with directions to determine the extent of disability of the scheduled member, i.e., the right upper extremity.
Although other questions are presented for determination, the principal dispute to be resolved is whether claimant has suffered an injury to the body as a whole, as the *44 deputy found, or has sustained only a scheduled injury, as decided by the Full Commission. A decision on this question requires that we determine (1) whether there is competent substantial evidence to support the deputy's finding that the elbow injury also resulted in disability of the shoulder, and (2) if the evidence does support such a finding, whether, as a matter of law, the shoulder involvement creates an "unscheduled injury" under Section 440.15 (3) (4), F.S.A.
In this case the deputy was confronted with the conflicting testimony of two treating physicians. Dr. Baird, called by the carrier, testified that the claimant's injury was confined to the elbow, and that the shoulder difficulties were in no way connected to the elbow injury. He expressed the opinion that claimant's shoulder complaints could be caused by a nodule on the fourth finger of claimant's right hand. Dr. Baird stated that such a condition is very painful; that "there is a radiation of pain all the way up the arm to the shoulder," and "although the patholgy is related to the finger, very frequently [these people] can't tell you where they hurt." He concluded by asserting that the nodule on the finger problem was not related to the elbow injury.
The physician called by the claimant, Dr. Reinherz, was of the opinion claimant's shoulder problem was an indirect result of the injury to the elbow. He testified that the shoulder complaint was largely subjective, but that on three or four occasions he had felt "kinks" (i.e., areas of spasm) in the posterior shoulder. He stated, further, it was his opinion that the weakness or "disfunction" of the elbow caused over use of the shoulder with the resulting effect of weakness and pain in the shoulder.
Thus, we have diametrically opposed opinions from two, apparently, well-qualified doctors. Clearly, however, the deputy rejected the testimony of Dr. Baird, and accepted the theory advanced by Dr. Reinherz.
As we have repeatedly held, it is not for us, nor the Commission, to assess the probative force of the medical testimony. In United States Casualty Co. v. Maryland Casualty Co., 55 So.2d 741, 745 (Fla. 1951), we said:
"The fact-finding arbiter is usually in a better position than the reviewing body to judge the ability, experience and reputation of the various so-called expert witnesses who appear personally before him and to determine the weight which should be given their testimony. * * * Even in cases which must be resolved upon a true appraisal of testimony of medical experts, the deputy commissioner's findings of fact should be upheld unless there is no competent, substantial evidence, which accords with logic and reason, to sustain them."
The acceptance and rejection of the medical testimony rests with the deputy, and his discretion should not be disturbed unless the medical testimony itself fails to meet the test of the substantial evidence rule. See Arkin Construction Company v. Simpkins, 99 So.2d 557 (Fla. 1957). We fail to see how it can be said that the testimony of Dr. Reinherz, as to the causative factor of the shoulder problem, is so unreasonable that it does not comport with logic and reason. Therefore, we are of the opinion that the Commission failed to observe the competent, substantial evidence rule in its examination of this record, and its order on this point must be quashed.
We move now to the matter of whether claimant's shoulder disability can give rise to an "unscheduled injury," or, in other words, an injury to the body as a whole.
We have consistently recognized the rule that if a scheduled injury produces disability or incapacity in some other member or portion of the body, not included in the specific schedule, the claimant is not restricted to benefits related only to the scheduled injury. *45 Little River Bank & Trust Company v. Neal, 154 So.2d 809 (Fla. 1963); Trieste v. Anchell, 143 So.2d 673 (Fla. 1962); Jewell v. Wood, 130 So.2d 277 (Fla. 1961); Hernandez v. De Carlo, 116 So.2d 429 (Fla. 1959); Kashin v. Food Fair, Inc., 97 So.2d 609 (Fla. 1957).
The employer and the respondent Commission rely heavily on our decision in Little River Bank & Trust Company v. Neal, supra, as authority for their position. The facts there were: Claimant had suffered an injury to her thumb with a resulting loss of its motion. The award made by the deputy commissioner compensated claimant on the basis of a residual disability of the hand. This Court reversed, saying that a thumb function loss could not be converted into a hand loss, because the statutory schedule of injury to, and loss of, specific parts of the body reflected the legislative consideration of the economic and functional relationship of the thumb to the whole hand. On that basis, we held that the legislative prescription must be followed and the injury be confined to the thumb.
The decision in the Neal case, in no fashion, indicates a retreat from the rule announced above. On the contrary, the rule was expressly reaffirmed therein when we said:
"* * * unless it be shown that a scheduled injury produces disability or incapacity in some other member or portion of the body, administrative agencies and the courts are bound to follow the legislative prescription for scheduled injuries." At 810 of 154 So.2d. (Emphasis added.)
The instant case is clearly controlled by our decision in Kashin v. Food Fair, Inc., supra. In the Kashin case we held that an injury to the thumb and fingers of a hand with a resulting shoulder-hand syndrome, or causalgia, affecting the use of the shoulder was properly determined to be a nonscheduled injury to the body as a whole, rather than a scheduled injury to the hand. In Hernandez v. De Carlo, supra, we again considered the shoulder as distinct from the arm, and held an injury affecting the shoulder warranted a finding of a body as a whole injury, rather than a scheduled injury to the arm.
Therefore, since we have found there is competent substantial evidence in the record to support the deputy's finding that the injury to claimant's arm also produced a disabling condition of the shoulder, we conclude that the deputy was correct in awarding compensation on the basis of an unscheduled injury.
We note here that the deputy, in making his award on the basis of loss of wage earning capacity, seems to have complied with the prescriptions set down in Ball v. Mann, 75 So.2d 758 (Fla. 1954). We cannot say the award of 30% permanent partial disability is without support in the record.
We go then to the next question presented by the claimant.
Claimant was treated by three doctors. The last to treat him, Dr. Reinherz, was not authorized by the employer-carrier to treat claimant, and failed to file the reports required by Section 440.13(1), F.S.A. Nevertheless, the deputy ordered the employer-carrier to pay Dr. Reinherz for his services. The Full Commission reversed this portion of the deputy's order on the double ground that (1) the services were not authorized by the employer-carrier, and (2) the doctor failed to submit the reports required by the statute.
Section 440.13(1), F.S.A. provides that no claim for medical services furnished by a physician of the employee's own choice is valid and enforceable unless the physician shall, "within ten days following the first treatment * * * furnish to the commission and to the employer a report of such injury and treatment on forms prescribed by the commission * * *." This provision is subject to the proviso that the filing of such reports may be excused for "good *46 cause" shown. Furthermore, this Court has held that the statutory requirement may be waived by conduct of the employer-carrier. See e.g., Foster v. Cooper, 143 Fla. 493, 197 So. 117 (1940).
In his order, the deputy found that Dr. Reinherz's statement for services was in the amount of $155.00 of which the carrier had already paid $146.50. Claimant makes the same allegation in his brief, and the employer-carrier neither denies that it has paid Dr. Reinherz $146.50 on account, nor explains why this payment should not constitute an acceptance of the doctors services and a waiver of the reports required to be made under the statute.
In Foster v. Cooper, supra, this Court stated that one of the purposes of the medical reports required by Section 440.13 (1) is protection of the employer from liability on unfounded or fraudulent claims. These reports also serve to keep the employer-carrier advised of the condition and progress of an injured employee and enable them to better determine their responsibility on such claims. Since the requirement of reports is for the benefit of the employer-carrier, the latter may, by their conduct, waive the requirement.
In the absence of a showing of mistake, fraud or other valid excuse, payment to a doctor for medical services rendered a claimant constitutes a waiver of any lack of authorization to treat, or failure of the doctor to file the reports required by the statute, to the extent of the services covered by the payment made.
In the instant case, the deputy found that the employer-carrier had paid $146.50 of a statement for $155.00. To the extent of the sums paid, we hold that the employer-carrier have waived their right to complain. However, as to the remainder of the services represented by the doctor's statement, the objection made by the employer-carrier must be sustained for the reasons stated by the Full Commission in its order.
We turn now to the cross-petition filed by the employer-carrier. Cross-petitioners contend that the Full Commission erred in affirming those portions of the deputy's order that: (1) awarded claimant travel expenses incident to medical treatment; (2) determined the average weekly wage to be $97.25, rather than $96.15 as stipulated by the parties; (3) found the date of maximum medical improvement to be October 17, 1962, rather than June 15, 1962; and (4) awarded fees to claimant's attorneys.
We can easily dispose of the last contention. The employer-carrier argue that claimant was unsuccessful in the proceedings before the Full Commission, and therefore was not entitled to an award of attorney's fees. Under this opinion, claimant must now be held to be a successful litigant and entitled to fees for the proceedings before the Full Commission. We will answer the other contentions in the order presented above.
Rule 18 of the Florida Industrial Commission's Rules of Procedure provides that an injured employee is entitled to be paid the "reasonable actual cost" of transportation expenses incurred in visits to and from the place of medical treatment. If claimant uses a private automobile, the rule provides that he shall be reimbursed at the rate of seven and one-half cents per mile "for all miles actually and necessarily traveled."
The cross-petitioners point out that Chapter 440, F.S.A., does not specifically require or authorize the payment of travel expenses incident to medical treatment. It is the position of the cross-petitioners that payment of travel expenses involves substantive rights of the parties that cannot be affected by a rule of the Full Commission, because the Legislature has not given it any authority to adopt such a rule.
Surprisingly, the propriety of compensating a claimant for travel expenses incurred in obtaining medical treatment has not been questioned or decided in the appellate courts *47 of this state. Employers and carriers have apparently assumed that such expenses were allowable since most compensation orders require their payment.
It is true, as contended by cross-petitioners, that Chapter 440 does not specifically require or authorize payment of travel expenses incurred in obtaining medical treatment. Nevertheless, we are of the view that Section 440.13, which requires the employer to furnish to the employee "such remedial treatment, care and attendance" as the injury shall require, must be interpreted to include reasonable travel expenses incurred by the employee in presenting himself at the place where such treatment and care is provided.
There can be no doubt that the Legislature intended that an injured employee be given medical treatment at the expense of the employer-carrier and without expense to himself. This legislative intent would not be fully accomplished if the employee were required to pay his own travel expenses necessarily incurred in obtaining medical treatment.
We doubt that anyone would question payment of an ambulance charge for transporting an injured employee to or from his home when necessary in the course of his treatment. Yet, technically, such a charge is not for "remedial treatment, care and attendance." Again, if a claimant were to be offered treatment by the employer at one of the out of state clinics, failure of the employer to also furnish travel expenses would make the offer of treatment an empty gesture. These two illustrations may be said to be unusual, but, as we view the question, the difference in the cited situations and travel by a claimant from his home to a doctor or hospital is one only in degree, not in kind.
Considering the purposes of the Workmen's Compensation Act and the benefits to be given injured employees by its terms, we conclude that travel expenses necessarily incurred in enjoying the medical benefits provided by the Act are an incident of medical care and treatment. Therefore, the employer-carrier must either furnish such transportation or pay claimant the reasonable actual cost thereof. Other jurisdictions have reached the same conclusion. Huhn v. Foley Bros., 221 Minn. 279, 22 N.W.2d 3 (1946); Newberry v. Youngs, 163 Neb. 397, 80 N.W.2d 165 (1956); Scruggs Bros. & Bill Garage v. State Industrial Commission, 94 Okla. 187, 221 P. 470 (1923).
Under this interpretation of Section 440.13, the part of said Rule 18, that requires the payment of the "reasonable actual cost" of travel expenses by the employer-carrier merely tracks the statute. This part of the rule is therefore not an attempted exercise of legislative power by the Commission so as to make it invalid.
We have greater difficulty, however, upholding the portion of the rule that establishes seven and one-half cents per mile as the sum to be paid for travel by private automobile. We have considered the provisions of Section 440.13(3) (a), which authorize the Commission to adopt a schedule of charges for medical treatment and services, but have concluded that the wording of the subsection authorizes the adoption of a schedule only for medical service and treatment rendered claimants by others. There is no other grant of authority to the Commission by the Legislature that authorizes the Commission to legislate the amount to be allowed for such travel.
Although the seven and one-half cents per mile established in the rule seems reasonable, and its establishment serves an excellent purpose by making proof unnecessary, the fact remains that this portion of the rule is legislative in nature, and enacted without authority. It must fall. This will mean that, unless the parties in workmen's compensation proceedings stipulate on a mileage rate, the reasonable actual cost of such travel expenses will have to be proved just as any other factual issue.
*48 The portion of the Full Commission's order approving that part of the deputy's order requiring the employer-carrier to pay the claimant reasonable actual cost of travel expenses incurred in obtaining medical treatment is affirmed. However, unless the amount to be paid is settled by stipulation, it will be necessary that claimant prove the sum due for such travel.
In the record, we find the parties stipulated that claimant's average weekly wage was in the amount of $96.15. In his order, the deputy found it to be $97.50 per week. On remand, the deputy's order must be corrected to show claimant's average weekly wage to be $96.15.
Dr. Baird, who treated claimant for almost two years, testified that the date of maximum medical improvement was June 15, 1962. He testified that on June 11, 1962, he advised claimant that he could either undergo surgery on his elbow or learn to live with it; that four days later claimant returned and declared that he did not want to undergo an operation; and that the doctor injected his elbow and discharged him. He later saw claimant once more on November 20, 1962.
On July 3, 1962, claimant consulted Dr. Reinherz, who saw him on six occasions. This doctor testified that the maximum medical improvement date was October 17, 1962. However, when asked the nature of his treatment of claimant he responded:
"Recommendations for treatment were the continuation of conservative therapy that he had been receiving prior, mainly ultrasound, and to the involved areas of the elbow and shoulder, an injection of (not understood by recorder)." (Emphasis added.)
Dr. Reinherz also was of the opinion that surgery was indicated with a favorable result to be expected, but without surgery claimant would probably have frequent recurrences of pain and limitation of motion of the elbow and shoulder.
In his report, which was made following his examination of claimant on November 20, 1962, Dr. Baird stated that claimant advised him that the treatments given by Reinherz "afforded temporary relief with no overall change in his symptomatology."
Neither Dr. Reinherz's testimony, nor that of the claimant, indicates there was any improvement in claimant's condition following his discharge by Dr. Baird on June 15, 1962. On the contrary, the claimant's testimony was to the effect that his condition was the same "all the way through."
In view of these facts, we are forced to the conclusion that Dr. Reinherz's treatment was merely supportive or palliative, and that there was no improvement in claimant's condition after June 15, 1962. This results in the conclusion that the deputy's finding of October 17, 1962, as being the date of maximum medical improvement, is not supported by competent, substantial evidence that accords with logic and reason; hence, it must fall. On remand, this date must be changed to June 15, 1962.
For the foregoing reasons, the petition and the cross-petition for writ of certiorari are both granted in part, and denied in part, and writs issued thereon. Accordingly, the order of the Full Commission is quashed in part, and affirmed in part, and the cause is remanded for further proceedings consistent herewith.
It is so ordered.
THOMAS, Acting C.J., and THORNAL, CALDWELL and HOBSON (Ret.), JJ., concur.