492 So.2d 427 (1986)
Marjorie E. DESMOND, Appellant,
v.
MEDIC AYERS NURSING HOME and Brown & Brown Self Insured Services, Appellees.
No. BF-250.
District Court of Appeal of Florida, First District.
July 23, 1986.
Marjorie E. Desmond, pro se.
Paul J. Morgan, of Zimmerman, Shuffield, Kiser & Sutcliffe, Orlando, for appellees.

ON MOTION FOR REHEARING
JOANOS, Judge.
The employer in this workers' compensation appeal has petitioned for rehearing of our opinion in the above-styled cause, alleging that our decision was based to a substantial degree on a report which was not received into evidence or considered by the deputy commissioner. Our legal holdings in the opinion are not dependent upon the report in question. However, to avoid the possibility that the opinion may cause confusion regarding our consideration of the report of Dr. Sacks, the opinion released on January 20, 1986, is withdrawn and the following opinion is substituted therefor. Accordingly, the motion for rehearing is treated as a motion for clarification, and is granted to the extent that it is addressed in this opinion. In all other respects, the motion is denied.
In this workers' compensation appeal, the claimant Marjorie E. Desmond seeks review of the deputy commissioner's final order which dismisses with prejudice the claimant's request for temporary total disability (TTD) benefits, payment of medical expenses, costs, penalties, interest, and attorney's fees. Claimant alleges the deputy commissioner erred in (1) finding that claimant did not sustain a work-related skin disease, and (2) refusing to accept into evidence a report prepared by Dr. Jeffrey J. Sacks, Acting State Epidemiologist. We reverse.
Claimant was employed as a nursing assistant by Medic Ayers Nursing Home (MANH) from March 8, 1982, until August 29, 1983. As part of her job duties, claimant assisted patients in bathing, dressing, cleaning, and eating.
At the time period relevant to this appeal, i.e., May  August 1983, claimant worked on the red wing of the nursing home, a wing which had a high concentration of patients with staph infection. In *428 June 1983, claimant developed lesions which first appeared in her left groin region. On June 21, 1983, claimant consulted Dr. Hauser, an osteopath who provided care for approximately thirty to forty patients at the nursing home.
During July 1983, claimant's mother-in-law visited the family. During the course of that visit, the mother-in-law developed skin lesions which were subsequently diagnosed by her family physician in Miami as a staph infection. Claimant's husband and five-year-old daughter also suffered an outbreak of skin lesions. Dr. Hauser considered claimant's skin condition to be a tinea, or fungal infection, and prescribed an ointment. Claimant's skin condition improved briefly, and then spread to her right groin area, abdomen, rib cage, and right breast.
In August 1983, claimant notified the nursing director at MANH of her condition, and advised that she was going to Shands Teaching Hospital for a culture. At that point, claimant was convinced that she had a staph infection. The nursing director told claimant that she could not return to work without a medical release. Claimant was treated by Dr. Joseph Shands, obtained the requisite medical release, and returned to work at MANH on August 12 or 13, 1983. As of August 12, 1983, claimant's lesions appeared to be drying and had begun to dissipate.
Up until the time of claimant's initial skin outbreak in June 1983, neither she nor any other member of her immediate family had ever experienced a skin problem. After claimant's husband and daughter had an outbreak of skin eruptions, her husband demanded an explanation. At that point claimant told her husband she had been caring for patients with staph infections. When claimant's husband was apprised of the staph outbreak at the nursing home, he confronted Dr. Hauser about the infections which, seemingly, had spread to claimant's family. Dr. Hauser, in his turn, berated the nursing director at MANH, accusing her of revealing problems pertaining to patient care. On August 29, 1983, claimant's employment with MANH was terminated. The reason given for termination was that claimant had breached patient confidentiality.
Claimant testified that during the first week of September 1983, she continued to have outbreaks of lesions on her body. On September 12, 1983, claimant returned to Dr. Shands for further treatment. Dr. Shands advised that the new outbreak of lesions indicated a contagious stage of the disease and told claimant not to work. Between August and October 1983, Dr. Shands treated claimant's staph infection with three different antibiotics. On October 4, 1983, Dr. Shands provided claimant with a medical release which states: "Mrs. Marjorie Desmond had staphylococcal disease but is now clear of this problem. She is able to work." Subsequently, in December 1983, claimant again returned to Shands for treatment of continued flareups of her skin disease. At that time claimant was told that continued treatment with antibiotics would be advisable only if she broke out in massive lesions.
Dr. Robert Sherertz, assistant professor of medicine and hospital epidemiologist at Shands Teaching Hospital, examined claimant and her husband and daughter on August 14, 1984  a year after claimant had come under the care of Dr. Shands. Dr. Sherertz reviewed claimant's medical records from Dr. Hauser and from Dr. Shands, and a report prepared by Dr. Sacks, State Epidemiologist. In addition to this review of records and the report, Dr. Sherertz discussed claimant's condition and treatment with Dr. Shands, and verified (by telephone) Dr. Sacks's conclusions concerning the 1983 staph epidemic at MANH.
According to Dr. Sherertz, Dr. Hauser, the initial treating physician, failed to perform one of the diagnostic tests indicated in claimant's case. Dr. Hauser did not culture claimant's lesions, and a culture is the appropriate diagnostic procedure when testing for staph. Instead, Dr. Hauser took a scraping, which he subjected to microscopic examination. In addition, Dr. Hauser sent slides to Smith Kline Laboratories *429 for analysis. Neither Dr. Hauser's examination nor the Smith Kline report identified a fungal infection. Despite these test results, Dr. Hauser diagnosed claimant's condition as a fungal infection. Dr. Sherertz stated that a physician cannot look at a vesicle as presented by claimant and described by Dr. Hauser, and declare that it is or is not staph, without performing a culture. In short, Dr. Hauser performed two of the three indicated tests. He looked for a virus and for fungi, but he did not test for bacteria  which is staph.
In August 1984, prior to the hearing in this cause, Dr. Sherertz examined claimant, and her husband and daughter. Claimant and her husband were free of staph at that time, although the daughter had a lesion which proved to be a staph infection. Dr. Sherertz indicated that he could not state of his own knowledge that claimant had a staph infection in June or in August 1983. Dr. Hauser, who saw claimant in June 1983, did not culture claimant's skin lesions, and did not diagnose her skin disorders as staph. On the other hand, Dr. Shands, who saw claimant from August until October 1983, diagnosed claimant's skin condition as staph. Dr. Sherertz found the evidence conflicting. Nevertheless, he was of the opinion that in view of the fact that the onset of claimant's infections coincided in time with an outbreak of staph at MANH, the best available evidence would tell him that there was a significant possibility that claimant acquired the organism while she was working at the nursing home. He went on to say that it was more likely than not that claimant acquired the staph infection while working at Medic Ayers Nursing Home.
For the most part, claimant has proceeded pro se on her claim for TTD benefits and medical expenses. However, she was represented by counsel at the final hearing. At that time, counsel attempted to place into evidence the medical records pertaining to claimant's treatment for a staph infection and the report by Dr. Sacks concerning the staph epidemic at MANH. The deputy excluded these reports on hearsay grounds. The deputy then determined that claimant's skin condition was not causally related to her employment at MANH and denied all benefits.
The principle is well established that in determining a worker's compensation claim, the deputy's function is to resolve conflicting evidence, and his discretion will not be disturbed unless the medical testimony itself fails to support his findings. Mobley v. Jack & Son Plumbing, 170 So.2d 41 (Fla. 1964); S & S Stove Repair, Inc. v. Dumas, 465 So.2d 644 (Fla. 1st DCA 1985); Reynolds v. Neisner Brothers, Inc., 436 So.2d 1070 (Fla. 1st DCA 1983). The evidentiary standard applicable to medical testimony in workers' compensation cases is the "substantial evidence" rule, i.e., "the deputy commissioner's findings of facts should be upheld unless there is no competent, substantial evidence, which accords with logic and reason, to sustain them." Martin v. Board of County Commissioners, 79 So.2d 513, 515 (Fla. 1955), citing United States Casualty Co. v. Maryland Casualty Co., 55 So.2d 741, 745 (Fla. 1951). See also: Finkel v. Enterprise Building Corp., 427 So.2d 1084, 1085 (Fla. 1st DCA 1983). Conversely, "[w]here the testimony and evidence are uncontradicted, a finding contrary to the manifest weight of such testimony and evidence is not supported by competent substantial evidence. Standard Oil Company v. Gay, 118 So.2d 212 (Fla. 1960); See: Willingham v. Boynton Service Corporation, 383 So.2d 710 (Fla. 1st DCA), rev. denied, 392 So.2d 1372 (Fla. 1980)." McCandless v. M.M. Parrish Construction, 449 So.2d 830, 834 (Fla. 1st DCA 1984). By the same token, any conclusions or opinions "of an expert witness based on facts or inferences not supported by the evidence in a cause [have] no evidential value." Arkin Construction Company v. Simpkins, 99 So.2d 557, 561 (Fla. 1957).
After our review of this record, we conclude that the deputy's order is not supported by the requisite substantial evidence. We note first that we do not agree with the deputy's view that the medical *430 testimony is conflicting. Although Dr. Sherertz found inconsistencies in the diagnoses of Dr. Hauser and Dr. Shands, these inconsistencies do not do violence to Dr. Sherertz's opinion that claimant contracted a staph infection during the course of her employment. In June 1983 Dr. Hauser tested claimant for a fungal and a viral infection. His test results were negative on both counts. Dr. Hauser did not test for bacteria, which is staph. Since Dr. Hauser's own tests ruled out his diagnosis of a fungal infection, his conclusion that claimant suffered from nothing more serious than a fungal infection has no evidential value and the deputy erred in accepting it. See: Arkin Construction Company v. Simpkins, 99 So.2d 557 (Fla. 1957). In August 1983, prior to the termination of her employment by the nursing home, claimant was examined by Dr. Shands at Shands Teaching Hospital. Dr. Sherertz testified that Dr. Shands diagnosed claimant's skin condition as a staph infection, which he treated with antibiotics. Dr. Shands's initial diagnosis was confirmed by the results of a skin culture. The record indicates that the results of the culture were received after claimant had been fired. Nevertheless, claimant's exposure to staph infection and Dr. Shands' preliminary diagnosis of staph antedated claimant's termination of employment by the nursing home.
During the time period in which claimant experienced the onset and subsequent worsening of her skin infection, MANH was in the throes of a staph outbreak. In Dr. Sherertz's opinion, the nursing home experienced a staph epidemic which coincided in time with claimant's employment there, and the fact that the highest incidence of staph cases occurred on the wing where claimant worked, made it more likely than not that claimant acquired her staph infection while working at the nursing home. We find that Dr. Sherertz's opinion comports with logic and reason. Therefore, we reverse the deputy's finding that claimant did not sustain a work-related injury as not supported by substantial evidence.
Claimant's second challenge is directed to the exclusion, on hearsay grounds, of the report prepared by Dr. Jeffrey J. Sacks, Acting State Epidemiologist. We note at the outset that the discussion concerning the admissibility of Dr. Sacks's report was not made a part of the record, therefore we can only surmise that the report was offered to prove that MANH experienced a staph epidemic concurrent with claimant's employment there. If in fact the report was offered for this purpose, it is within the statutory definition of hearsay[1] insofar as proof of conditions at the nursing home are concerned, since the report was "offered for the truth of the matter asserted," and Dr. Sacks did not testify at the hearing. s. 90.801(1)(c), Fla. Stat. (1983). Nevertheless, the report was admissible under the "public records" exception to the hearsay rule,[2] since it was prepared pursuant to a "duty imposed by law as to matters which there was a duty to report." s. 90.803(8), Fla. Stat. (1983). In this case, Dr. Sacks's duty to report was imposed by Section 400.19(3), Florida Statutes,[3] which requires the Department of *431 Health and Rehabilitative Services to conduct at least one unannounced annual inspection of nursing homes, and in the event of a deficiency, to conduct any necessary subsequent inspections to insure nursing home compliance with department standards. Thus, by statute Dr. Sacks was obligated to report the results of field investigators' findings concerning conditions at MANH to the HRS licensing office together with his recommendations pursuant to those investigations. See: University of North Florida v. Unemployment Appeals Commission, 445 So.2d 1062, 1063 (Fla. 1st DCA 1984); Sikes v. Seaboard Coast Line Railroad Company, 429 So.2d 1216, 1220-1222 (Fla. 1st DCA 1983).
Accordingly, we reverse both points raised in this appeal and remand for proceedings consistent with this opinion.
WENTWORTH and THOMPSON, JJ., concur.
NOTES
[1] §§ 90.801(1)(c), and (2) Fla. Stat. (1983), provide in relevant part, that:

(1)(c) "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement ...
[2] § 90.803, Fla. Stat. (1983), provides:

The provision of s. 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness:
(8) PUBLIC RECORDS AND REPORTS.  Records, reports, statements reduced to writing, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency, or matters observed pursuant to duty imposed by law as to matters which there was a duty to report, excluding in criminal cases matters observed by a police officer or other law enforcement personnel, unless the sources of information or other circumstances show their lack of trustworthiness.
[3] § 400.19(3), Fla. Stat. (1983), provides:

(3) The department shall annually conduct at least one unannounced inspection to determine compliance by the licensee with statutes, and with rules promulgated under the provisions of those statutes, governing minimum standards of construction, quality and adequacy of care, and rights of residents. The department shall verify through subsequent inspection that any deficiency identified during the annual inspection is corrected. The giving or causing to be given of advance notice of such unannounced inspections by an employee of the department to any unauthorized person shall constitute cause of suspension of not fewer than 5 working days according to the provisions of chapter 110.