666 A.2d 1239

**SEARS, ROEBUCK AND COMPANY, INC. et al.**

v.

**Anne M. RALPH.**

**No. 20 Sept. Term, 1995.**

Court of Appeals of Maryland.

Nov. 9, 1995.

Allan H. Kittleman, Herwig & Humphreys, Baltimore, for Petitioner.

Bruce M. Bender, Van Grack, Axelson, Williamowsky & Jacobs, P.C., Rockville, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

In this workers' compensation case the claim is for permanent total disability allegedly resulting from a low back injury suffered by a claimant who died while receiving temporary total disability compensation and who, months after his death, was rated for permanency by his former treating physician. The employer and insurer contend that a posthumous rating is incompetent evidence, *per se*, in "other cases" determinations, and, in any event, that the medical history of this claimant is legally insufficient to support an "other cases" determination. The Workers' Compensation Commission (the Commission) denied the claim, and, by summary judgment, the Circuit Court for Montgomery County agreed. The Court of Special Appeals reversed. *Ralph v. Sears, Roebuck & Co.*, 102 Md. App. 387, 649 A.2d 1179 (1994). On the petition of the employer and insurer, we issued the writ of certiorari. For the reasons explained below, we affirm the Court of Special Appeals.

Calvin T. Ralph, Sr. (Claimant), now deceased, was the husband of the respondent, Anne M. Ralph (Mrs. Ralph). Claimant was employed to service and repair appliances by one of the petitioners, Sears, Roebuck and Company, Inc., whose compensation carrier is the petitioner, Allstate Insurance Company. The employer and insurer are hereinafter collectively referred to as "Sears." On February 20, 1991,

Claimant, then age 60, slipped and fell on wet leaves on patio steps at a customer's house while going to inspect a dryer vent. He injured his lower back in the fall. Thereafter Sears paid Claimant temporary total disability compensation until his death of unrelated causes on November 9, 1991.

Complaining of low back pain, with pain radiating to both hips, Claimant saw Dr. Harikant C. Shah on March 1, 1991. X-rays revealed disc narrowing, osteophyte formation, and degenerative changes. Dr. Shah prescribed conservative treatment. Following a visit on March 15 Dr. Shah ordered a CT scan. It revealed "[s]evere degenerative disc and bony disease at all levels. The regions of most severe disease with probable nerve root impingement are L2–3 on the right, L3–4 on the right, and L4–5 on the left." Thereafter Dr. Shah saw Claimant on five occasions between April 8 and May 31. During that period the form, "Notice of Employee's Claim," was filed with the Commission by or on behalf of Claimant. Dr. Shah also referred Claimant to Dr. Nathan C. Moskowitz for a neurosurgical evaluation that was performed on June 3. Dr. Moskowitz concluded that, "[i]n order to adequately define [Claimant's] nerve roots and come up with a rational therapeutic decision, it will be necessary for him to have a myelogram followed by a CT scan."

The next day the Claimant was examined and evaluated at the request of Sears by Dr. Herbert H. Joseph. Dr. Joseph diagnosed "residual low back strain." He found "[t]he straight leg raising test and neurologic exam [to be] completely negative." He saw no reason for surgical intervention or for further diagnostic studies. He recommended "a short course of mobilization ... as well as some work hardening." He anticipated "improvement, with return to work on a light duty status within two to four weeks of instituting treatment." In light of Dr. Joseph's report, Sears would not agree to pay for a myelogram.

Thereafter Claimant was seen by Dr. Shah on June 10 and 21. Of significance to the instant claim is Dr. Shah's note of the latter visit. It reads as follows:

"Patient's lumbar spine pain continues. Patient has increased left leg pain. Straight leg raising test is positive on the left side. Patient walks with a limp and he has difficulty walking on the toes. Patient is totally disabled for any gainful employment; moist heat, hot showers, rest at home. Reevaluation in 2 weeks."

That same day Dr. Shah wrote to Sears saying in part:

"I do not feel that [Claimant] is a candidate for any work-hardening program, since he will not be able to tolerate bending and sitting or standing at this time. Whether he will be a candidate for a lighter job schedule is always a possibility, but at this time I do not feel that he is ready for that either."

Claimant saw Dr. Shah on July 8, 17, and 29 and on August 7 and 30. On all occasions when Dr. Shah saw Claimant, Dr. Shah recorded notes of Claimant's complaints and of Dr. Shah's observations and recommendations.

In late August 1991 Claimant was diagnosed with colon cancer that had metasticized to the liver. He underwent surgery in September and died in November 1991.

Mrs. Ralph continued the claim pursuant to Md.Code (1991), §§ 9–640 and 9–632 of the Labor and Employment Article (LE).[1]

█ Four months after Claimant's death, Dr. Shah, in a letter to counsel for Mrs. Ralph, expressed the following opinion:

---

1. Labor & Employment Article, § 9–640(b) provides:

"If a covered employee dies from a cause that is not compensable under this title, the right to compensation that is payable under this Part V [Permanent Total Disability] of this subtitle and unpaid on the date of death survives in accordance with this section to the extent of $45,000, as increased by the cost of living adjustments under § 9–638 of this Part V of this subtitle."

Section 9–632(b) provides:

"If a covered employee dies from a cause that is not compensable under this title, the right to compensation that is payable under this Part IV [Permanent Partial Disability] of this subtitle and unpaid on the date of death survives in accordance with this section."

"[Claimant], who sustained injury to his lumbar spine and developed disabling lower back pain, indeed has a permanent partial disability of his lumbar spine at 50%, and total body disability at 40%. His disability to return back to his previous job is 100%. This disability is given according to AMA Guidelines of the Third Edition for Evaluation of Permanent Impairment."

Hearing before the Commission was held in March 1993. The Commission found that Claimant "had not reached maximum medical improvement at the time of his death from unrelated causes" with the result "that the issue of nature and extent of disability is not applicable...." "Maximum medical improvement" is the stage at which workers' compensation claimants have "reached a point of stability in their disease and they have benefited maximally from their interventional medical care." *Alexander v. Montgomery County*, 87 Md. App. 275, 279, 589 A.2d 563, 565 (1991).

Following an appeal to the Circuit Court for Montgomery County, the parties respectively moved for summary judgment. The court granted Sears's motion. Mrs. Ralph moved to alter the judgment, and, in support thereof, submitted an undated affidavit from Dr. Shah. In that affidavit, Dr. Shah referred to his June 21 letter to Sears that mentioned the "possibility" of a lighter job schedule. Dr. Shah explained that that statement referred to a mere possibility and did not express a medical opinion. He said that, as of June 21, 1991, he "did not feel [that Claimant] would ever work again," and that Claimant had "reached maximum medical improvement on June 10, 1991...." His opinion, to a reasonable degree of medical probability, was "that from June 10, 1991 throughout the rest of [Claimant's] life ... he was unable to return to any gainful employment because of his work related injuries and was permanently totally disabled from working." The circuit court denied the motion to alter judgment.

In granting summary judgment to Sears the court ruled "that as a matter of law, in this case I don't see how there could be presented the necessary evidence for a decision to be

made as to industrial loss of use...." The court indicated that the issue was "very fact-specific just to the circumstances which arose and the timing of how it arose and what had occurred before Mr. Ralph's death...."

It is clear that the circuit court did not predicate the grant of summary judgment on the absence of evidence to support Claimant's having reached maximum medical improvement. Consequently, we do not consider Sears's arguments directed to that issue. *See Blades v. Woods,* 338 Md. 475, 659 A.2d 872 (1995). Whether the circuit court predicated summary judgment on the absence of a medical rating prior to Claimant's death, or on the inadequacy of the total medical history to support a posthumous loss of industrial use determination, is not as clear.

Sears's petition for certiorari embraces both aspects of the summary judgment grant. The questions which this Court undertook to review are:

"1. May posthumous permanent impairment ratings be used as evidence in workers' compensation cases?

"2. Did the Court of Special Appeals err in reversing the Circuit Court decision that Ms. Ralph could not present the necessary evidence to support a finding of industrial loss of use of the body?"

Sears and an amicus, Harford Mutual Insurance Co., submit that Maryland law requires a bright line rule of inadmissibility for posthumous medical ratings in "other cases." Although there is no express statutory prohibition of posthumous ratings, the submission is that that result is necessarily implied from a combination of statutory provisions. The argument is limited to permanent disability, as distinguished from temporary disability, and to compensation awarded under the "other cases" section, LE § 9–627(k), as distinguished from compensation for loss of use of members, or parts of members, of the body that are scheduled in LE § 9–627(a) through (j).

One of the components of Sears's argument is LE § 9–721. It reads:

**"Evaluation of permanent impairments.**

"(a) *In accordance with regulations.*—A physician shall evaluate a permanent impairment and report the evaluation to the Commission in accordance with the regulations of the Commission.

"(b) *Contents of evaluation.*—A medical evaluation of a permanent impairment shall include information about:

"(1) atrophy;

"(2) pain;

"(3) weakness; and

"(4) loss of endurance, function, and range of motion."

Regulations of the Commission complement the statute. Maryland Regs.Code (COMAR) Title 14, § 09.04.02 provides general guidelines for evaluation of permanent impairment. Incorporated by reference into that regulation are the provisions of American Medical Association, *Guides to the Evaluation of Permanent Impairment* (3d ed. 1988) (*Guides*). COMAR § 14.09.04.01. Under the regulation a party may submit a written evaluation of permanent impairment prepared by a physician. COMAR § 14.09.04.02A. The physician preparing an evaluation is required to conform to the format of the *Guides* and to use numerical ratings set forth in the *Guides*. Reg. § .02B(1) and (2). Under Reg. § .02B(4) the items required by LE § 9–721 are to be included, but under Reg. § .02C the physician "may include numerical ratings not set forth in the" *Guides* for those items. "If the physician does so, the physician shall include in the evaluation the detailed findings that support those numerical ratings." *Id.*

In the instant case, Mrs. Ralph contends that the Claimant was permanently totally disabled. We have said that

"[p]ermanent total disability envisions a condition in which a claimant is incapable of doing work of any kind, and not just the kind that the claimant was accustomed and qualified to do at the time of the accident. While it does not mean that the claimant must be utterly and abjectly helpless, it does mean that he or she is able to perform services so limited in

quality, dependability, or quantity, that a reasonably stable market for them does not exist."

*Baltimore v. Cassidy,* 338 Md. 88, 98, 656 A.2d 757, 762 (1995) (citations omitted).

■ Where, as here, the alleged injury is to the lumbar spine, an unscheduled injury, the Commission must apply LE § 9–627(k) in order to determine the percentage of permanent disability. In relevant part that subsection provides:

"(1) In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the industrial use of the covered employee's body was impaired as a result of the accidental personal injury or occupational disease.

"(2) In making a determination under paragraph (1) of this subsection, the Commission shall consider factors including:

"(i) the nature of the physical disability; and

"(ii) the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred."

These factors apply to a determination of permanent total disability as well. *Giant Food, Inc. v. Coffey,* 52 Md.App. 572, 578, 451 A.2d 151, 154–55 (1982), *cert. denied,* 295 Md. 283 (1983).

■ Sears's principal contention seems to be that the permanent impairment evaluation that is required by LE §§ 9–721 and 9–627(k) cannot be furnished by a medical witness to the Commission where the medical witness has not gone on record in some fashion with a permanent impairment evaluation during the lifetime of the claimant. Certainly there may be circumstances in a number of cases where the result for which Sears contends will be the outcome, but it does not follow that that result must obtain in all posthumous evaluation cases. Where the underlying information and data obtained by the physician during the decedent's lifetime enable the physician to express a permanent impairment evaluation in conformity with the *Guides,* nothing in the statutes, the

legislative history, or the regulations excludes that evaluation simply because the underlying information and data had not been expressed in the form of a *Guides*-complying report until after the claimant's death.

The predecessor of LE § 9–721 was Md.Code (1957, 1987 Repl.Vol.), Art. 101, § 36C. Section 36C was enacted by Chapter 591 of the Acts of 1987 which was companion legislation with Chapter 590 of the Acts of that same year. The broad purpose of the two enactments was to reduce the costs of workers' compensation insurance in Maryland. Former Art. 101, § 36C mandated use of the *Guides* beginning July 1, 1987 and required the Commission prior to July 1, 1988 to adopt guides by regulation. When former Art. 101 was revised and enacted by Chapter 8 of the Acts of 1991 as part of the Labor and Employment Article, the Commission had adopted COMAR §§ 14.09.04.01 and .02. Thus, LE § 9–721 omits the requirement for the adoption of regulations by the Commission but, otherwise, makes no substantial change from former § 36C. *See* Revisor's Note following LE § 9–721. A review of the bill files of the Department of Legislative Services underlying former § 36C indicates that its purpose was to effect a greater consistency in permanent impairment evaluations so that litigation, and its costs, would be reduced.

The *Guides* distinguish "impairment" and "disability."

"[A]s used in the *Guides,* 'impairment' means an alteration of an individual's health status that is *assessed by medical means,* 'disability,' which is *assessed by nonmedical means,* means an alteration of an individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements. Simply stated, 'impairment' is what is wrong with the health of an individual; 'disability' is the gap between what the individual can do and what the individual needs or wants to do."

*Guides* at 2.

"One major objective of the *Guides* is to define the process of measuring and reporting medical impairment in sufficient detail so that physicians have the capability to collect, analyze,

and report information about the medical impairment of claimants in accordance with a single set of standards." *Id.* at 7. To that end, clinical chapters in the *Guides* "contain definitive medical evaluation protocols, descriptions of specific procedures for evaluating a particular body part, function, or system, each developed by recognized medical specialty consultants." *Id.* at 4.

The premise underlying the potential of the *Guides* for cost reduction is perhaps best expressed in the following passage:

"Clearly, if the physicians have not obtained similar results and reached similar conclusions, there is a reference framework within which to resolve the discrepancies. Analysis of records and reports will disclose the areas of discrepancy. In such a case, the differences must occur in the clinical findings, which are *matters of fact, not opinion,* that can be verified by further observation of the claimant in accordance with the appropriate medical evaluation protocol. When the medical condition has become static or stabilized, the findings should be replicable in repeated examinations. If this is not the case, then the stability of the medical condition is in question, and there is no basis upon which to rate *permanent* impairment."

*Id.* at 7.

Of course, where, as here, there are differing impairment evaluations and the claimant is dead, the difference in *"matters of fact, not opinion"* cannot be resolved by further observation. That does not mean, however, that under the Maryland Workers' Compensation Act (the Act) the claim must be rejected.

The survival provisions of the Act were construed in *State v. Richardson,* 233 Md. 534, 197 A.2d 428 (1964). We there held that "compensation payable" as used in the non-abatement provision, Md.Code (1957), Art. 101, § 36(4)(c), did not require an award to have been rendered prior to the claimant's death. After reviewing decisions in other states, this Court felt "constrained, in view of the phraseology of § 36(4)(c) of the Maryland statute, to follow the reasoning of those cases which

sustained awards made when the claimant had filed a claim but died from other non-compensable causes before a hearing could be held." *Id.* at 540, 197 A.2d at 431. This Court said "that 'payable' is not limited to mean payable because of an award, but instead means legally payable under the Act due to the occurrence of a compensable injury resulting in permanent partial disability." *Id.* at 541, 197 A.2d at 431.

LE §§ 9–640(b) and 9–632(b) continue to provide for the survival of the claim that is "payable," and thus carry forward the *Richardson* construction. Further, the claimant in *Richardson* was not available for additional impairment evaluations prior to the hearing on the contested issue of permanency of disability. In the face of the *Richardson* precedent, the enactment of LE § 9–721 does not by implication create a *per se* rule effectively eliminating the survival of compensation when death of the claimant from unrelated causes prevents reexamination where permanency is contested.

Sears seeks to distinguish *Richardson* as a case involving a scheduled member, there, a foot. Although the task of the Commission in converting a credible permanency impairment evaluation into an award may be less complex for scheduled members, *Richardson*'s analysis does not distinguish between scheduled members and other cases.

In *Richardson,* the employer and insurer additionally contended that there was no way "fairly and accurately" to evaluate the disability of the deceased claimant. 233 Md. at 542, 197 A.2d at 432. Recognizing that "some cases might present a difficulty as to whether proof would be adequate," this Court held that the problem was not present in *Richardson. Id.* Richardson had "filed a claim describing his injuries and disability, and he had been examined ... by doctors; [and] hospital records were available. . . ." *Id.* All of these factors are present in the instant matter. Richardson had also been rated by doctors and had been present, available for cross-examination, at a hearing on temporary total disability. Sears argues that *Richardson* makes a pre-death rating indispensable. Nowhere, however, does *Richardson* suggest that a

pre-death impairment evaluation is an absolute minimum in all cases. Rather, the general tenor of *Richardson* is that adequacy of proof in survival of compensation cases is to be determined on a case-by-case basis from all of the available evidence, including examinations by physicians, tests, and hospital records.

The vast majority of cases in states which, like Maryland, do not require an award prior to the claimant's death in order for a claim to survive, view the issue of the adequacy of the evidence supporting an impairment evaluation of the decedent to be a case-by-case determination. Cases finding that the pre-death medical record was sufficient to support an award include *Reed v. Industrial Comm'n of Arizona*, 104 Ariz. 412, 454 P.2d 157 (1969) (remand for evidentiary hearing after holding award during lifetime not necessary); *Snyder Constr. Co. v. Thompson*, 145 Ind.App. 103, 248 N.E.2d 560 (1969); *Robinson v. Newberg*, 849 S.W.2d 532 (Ky.1993); *Hall v. Banks*, 395 S.W.2d 776 (Ky.1965); *Wilhite v. Liberty Veneer Co.*, 303 N.C. 281, 278 S.E.2d 234 (1981); *Bridges v. McCrary Stone Servs., Inc.*, 48 N.C.App. 185, 268 S.E.2d 559 (1980); *Petition of Doran*, 123 N.H. 429, 462 A.2d 114 (1983); *Kozielec v. Mack Mfg. Corp.*, 29 N.J.Super. 272, 102 A.2d 404 (1953); *Riley v. Syracuse Univ.*, 56 A.D.2d 163, 391 N.Y.S.2d 921 (1977); *Grennell v. Driveway Paving Co.*, 12 A.D.2d 697, 208 N.Y.S.2d 169 (1960); *In re Lauble's Case*, 341 Mass. 520, 170 N.E.2d 720 (1960); *Associated Town "N" Country Builders, Inc. v. Workmen's Compensation Appeal Bd.*, 95 Pa.Commw. 461, 505 A.2d 1358 (1986). Survival claims have been denied where the evidence was insufficient to show that maximum medical improvement had been reached. *See, e.g., Adzima v. UAC/Norden Div.*, 177 Conn. 107, 411 A.2d 924 (1979); *County of Spotsylvania v. Hart*, 218 Va. 565, 238 S.E.2d 813 (1977).

■ For the foregoing reasons we hold that posthumous permanent impairment ratings may be used as evidence in workers' compensation cases. Thus we disagree with the opinion expressed in R.P. Gilbert & R.L. Humphreys, Jr.,

*Maryland Workers' Compensation Handbook,* § 9.5–4 (1988 & 1995 Supp.).[2]

██ Sears also contends that in this particular case Mrs. Ralph could not present "necessary evidence to support a finding of industrial loss of use of the [Claimant's] body." The contention focuses on a function of the Commission under LE § 9–627(k). With respect to that section we have said (bracketed matter inserts the *Guides* terminology):

> "Unlike when the loss is a scheduled loss, in the case of 'Other Cases' the nature of the physical disability [impairment] alone is not dispositive. Rather, taking it into account, along with the specific occupational characteristics of the claimant, the Commission is required to determine the extent to which the specific physical disability [impairment] impairs the industrial use of the claimant's body [extent of disability]."

*Cassidy,* 338 Md. at 96, 656 A.2d at 761.

In the instant matter it is the impairment evaluation underlying the disability determination that is said to lack evidentiary support. Dr. Shah, however, expressly stated in his posthumous rating that it was made in accordance with the *Guides.* Whether it was or not involves a credibility determination that the circuit court could not make on summary judgment.

It appears that the report by Dr. Shah expressing his impairment evaluation may not be in the format that is in

---

2. Gilbert & Humphreys, in § 9.5–4, state in relevant part:
   "If the following conditions are satisfied, the Commission may consider a posthumous award of permanency benefits:
   "1. Before the date of death a physician has declared that the claimant has reached maximum medical improvement; and
   "2. Before the date of death at least one qualified physician has rated the claimant's permanent partial disability attributable to the claim; and
   "3. The pre-death rating examination included comment upon all of the elements mandated for ratings by the Act."
   The authors cite no authority under which the above-quoted conditions are limitations on the power of the Commission.

strict accordance with the *Guides*. That is not, however, the ground on which summary judgment was granted. We intimate no opinion on whether there was format non-compliance and, if so, what the sanction might be.[3]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS, SEARS, ROEBUCK AND COMPANY, INC. AND ALLSTATE INSURANCE COMPANY.*

---

**3.** COMAR § 14.09.04.02(E) states that "[t]he Commission may not approve payment of a physician's fee for an evaluation that does not comply with this regulation."