694 A.2d 961

**Patricia M. GETSON**

v.

**WM BANCORP et al.**

**No. 87, Sept. Term, 1996.**

Court of Appeals of Maryland.

June 12, 1997.

John A. Schruefer, Jr. (Seigel, Tully & Furrer, on brief), Baltimore, for Petitioner.

John J. Coyle, Jr. (Hidey, Coyle & Monteleone, on brief), Cumberland, for Respondents.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and RAKER, JJ., and ROBERT C. MURPHY, J. (Retired, Specially Assigned).

RAKER, Judge.

In this workers' compensation case, the claimant suffered a compensable injury to her right shoulder when she slipped and fell on the ice in her employer's parking lot on February 4, 1993. The primary question we must decide in this case is whether a shoulder injury, which causes permanent partial disability, is an injury to the arm under Maryland Code (1991 Repl.Vol., 1996 Cum.Supp.) § 9–627(d)(1)(iii) of the Labor and Employment Article [1] or whether permanent partial disability resulting from a shoulder injury is properly classified under § 9–627(k), "Other cases." We must also decide whether the Court of Special Appeals erred in concluding that the Workers' Compensation Commission ("Commission") committed an error of law when it awarded permanent partial disability benefits based on thirty percent loss of industrial use of the body. We shall hold that the Commission correctly categorized claimant's injury as an "Other cases" impairment and

---

[1]. The Maryland Workers' Compensation Act is codified at Title 9 of the Labor and Employment Article of the Maryland Code. Unless otherwise indicated, all statutory references hereinafter are to the Act. Md.Code (1991 Repl.Vol., 1996 Cum.Supp.) Labor and Employment Article.

that the finding of permanent partial disability based on thirty percent loss of use of the body was not error.

The claimant, Patricia M. Getson, sustained an accidental injury to her right shoulder arising out of and in the course of her employment with WM Bancorp. Getson fell on ice in her employer's parking lot on February 4, 1993, fracturing the right humeral head of her right shoulder.[2] She underwent surgery to repair her rotator cuff and to have inserted a prosthesis in her right shoulder. After the surgery, Getson received six months of physical therapy to regain mobility and strength in her right shoulder. Eventually, in late summer 1993, Getson returned to her position as a bank teller with Respondent WM Bancorp. She was able to perform most of her duties as a teller, but she could not lift heavy trays of coins, and she had difficulty reaching over a high counter to give customers their money.

The claimant completed her course of treatment and was evaluated by two physicians, Dr. Renato Lapidario at the request of the employer and insurer, and Dr. Neil Novin at the request of the claimant. Dr. Lapidario concluded that the claimant sustained an injury to her right shoulder resulting in a twenty percent permanent impairment of her right upper extremity; Dr. Novin concluded that the claimant sustained an injury to her right shoulder resulting in a forty-one percent permanent impairment of her right upper extremity.

Getson filed a Workers' Compensation claim for an accidental injury. The Commission held a hearing on her claim on October 25, 1994. The issue before the Commission was permanent disability. Concluding that an impairment of the shoulder is considered an impairment of the "whole person," [3]

---

**2.** The humeral head is the rounded end of the humerus, the long, upper arm bone. The humeral head fits together with the junction of the clavicle and the scapula to form the shoulder joint. 3 R. Ausman & D. Snyder, Medical Library Lawyer's Edition § 4.2 (1989).

**3.** There are two categories of injuries for purposes of permanent partial disability under § 9–627—those that are "scheduled," or specifically listed and those that are "unscheduled" and fall within the "Other

the Commission found that Getson had suffered a permanent partial disability resulting in a thirty percent loss of industrial use of her body as a result of the accidental injury.

The employer and insurer petitioned the Circuit Court for Alleghany County for judicial review of the Commission's order and presented two arguments: first, that the Commission should have decided the case as a loss of use of the arm or upper extremity, not of the whole body, because the *Guides for Evaluation of Permanent Impairment*[4], AMERICAN MEDICAL ASSOCIATION, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT (3d ed.1988) (hereinafter AMA GUIDES), adopted by the Commission as the method of evaluation of permanent impairment, define the arm or upper extremity to include the shoulder; and second, that if the Commission properly classified the shoulder injury as one to the whole body, it should have followed its regulations and converted impairment of the

---

cases" category of § 9–627(k). In § 9–627(b) through § 9–627(j), the General Assembly has ascribed the duration of compensation, measured in weeks, for the loss of each scheduled body part. Among the scheduled injuries are loss of use of the thumb, finger, toe, hand, arm, foot, leg, eye, hearing, and septum. Section 9–627 assigns to each scheduled injury the number of weeks for which compensation is available for that injury. Not all injuries are scheduled. Section 9–627 contains a "catch-all" provision, entitled "Other cases," § 9–627(k), for permanent partial disability not listed elsewhere in the section. Section 9–627(k), "Other cases," provides, in pertinent part:

In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the *industrial use of the covered employee's body* was impaired as a result of the accidental personal injury or occupational disease.

Section 9–627(k) differs from the scheduled provisions in that § 9–627(k) speaks in terms of loss of "industrial use of the covered employee's body" rather than loss of use of the specific body part. The General Assembly has set 500 weeks as the maximum duration of compensation for whole body injuries under "Other cases."

**4.** The *Guides to the Evaluation of Permanent Impairment,* AMERICAN MEDICAL ASSOCIATION, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT (3d ed.1988), is published by the American Medical Association and contains standardized procedures and protocols for doctors to use when assessing permanent impairment. COMAR 14.09.04 mandates that physicians evaluating patients for purposes of workers' compensation conform their findings and reports to the *AMA Guides.*

upper extremity to impairment of the body as a whole, in accordance with the conversion tables in the *AMA Guides.* The circuit court affirmed the Commission, finding that the Commission properly classified Getson's injury as an "Other cases" injury under § 9–627(k) and properly apportioned the injury to the body as a whole.

The employer and insurer appealed to the Court of Special Appeals. The Court of Special Appeals, in an unreported opinion, affirmed the circuit court in part and reversed in part. The intermediate appellate court held that a shoulder injury is an unscheduled injury, falling within the classification of "Other cases" under § 9–627(k). The court further held that the Commission improperly used whole body impairment to assess claimant's permanent partial disability. Reasoning that it is illogical to require evaluating physicians to use the numerical ratings in the *AMA Guides* but not to require the Commission to do so, the intermediate appellate court held that the Commission failed to abide by its own regulations and, hence, reversed.

We granted Getson's petition for writ of certiorari to resolve the following question: "Did the Court of Special Appeals err in finding that the Workers' Compensation Commission had committed an error of law in finding that the Claimant had sustained a 30% disability to her body as a whole?"

 We must determine whether the Commission properly classified Getson's injury under the "Other cases" provision of § 9–627(k). In other words, should Getson's shoulder injury be considered an unscheduled, "Other cases" injury or a scheduled injury to the arm? Only if the Commission properly classified the injury do we address whether the Commission expressed the degree of impairment in proper form.

Section 9–627 governs the classification of injuries for purposes of permanent partial disability compensation. Section 9–627 provides in pertinent part:

(a) If a covered employee is entitled to compensation for a permanent partial disability under this Part IV of this

subtitle, the employer or its insurer shall pay the covered employee compensation for the period stated in this section.

\* \* \* \* \* \*

(d) (1) Compensation shall be paid for the period listed for the loss of the following:

\* \* \* \* \* \*

(iii) an arm, 300 weeks;

\* \* \* \* \* \*

(k) *Other cases.*—(1) In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the industrial use of the covered employee's body was impaired as a result of the accidental personal injury or occupational disease.

(2) In making a determination under paragraph (1) of this subsection, the Commission shall consider factors including:

(i) the nature of the physical disability; and

(ii) the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred.

(3) The Commission shall award compensation to the covered employee in the proportion that the determined loss bears to 500 weeks.

(4) Compensation shall be paid to the covered employee at the rates listed for the period in §§ 9–628 through 9–630 of this Part IV of this subtitle.

The shoulder is not listed among the scheduled body parts in § 9–627. Accordingly, permanent partial disability resulting from a shoulder injury is governed by the catch-all "Other cases" provision of § 9–627(k).

Although this Court has not had occasion to consider the classification of a shoulder injury, the Court of Special Appeals has previously held that an injury to the shoulder is properly

classified as an "Other cases" impairment. *First National Bank v. Sohn,* 35 Md.App. 44, 368 A.2d 1122 (1977); *see also* R. GILBERT & R. HUMPHREYS, MARYLAND WORKERS' COMPENSATION HANDBOOK § 7.4, at 140 (2d ed. 1988) (" 'Whole body' injuries to such parts of the body as the back, neck, chest, or shoulder fall within the scope of 'Other cases.' "). Courts in other states with statutes containing distinctions between scheduled and unscheduled injuries similar to the Maryland statute have likewise concluded that shoulder injuries are unscheduled. *See, e.g., Dye v. Industrial Comm'n of Ariz.,* 153 Ariz. 292, 736 P.2d 376, 378 (1987); *Taylor v. Pfeiffer Plumbing & Heating Co.,* 8 Ark.App. 144, 648 S.W.2d 526, 527 (1983); *Mobley v. Jack & Son Plumbing,* 170 So.2d 41, 45 (Fla.1964); *Shebester–Bechtel v. Higginbottom,* 905 P.2d 1137, 1139 (Okla.Ct.App.1995); *Continental Ins. Co. v. Pruitt,* 541 S.W.2d 594, 597 (Tenn.1976).

Relying on § 9–721[5] and COMAR 14.09.04, the employer and insurer contend that the General Assembly and the Commission intended to incorporate the *AMA Guides* ' terminology and division of body parts into the Workers' Compensation Act. The *AMA Guides* do not use the "arm" as a unit of evaluation; instead, the *AMA Guides* speak in terms of the "upper extremity," which consists of the hand, wrist, elbow, and shoulder. AMA GUIDES, *supra,* § 3.1, at 13. The employer and insurer maintain that it is improper for the Commission to classify an injury to the shoulder as an "Other cases" injury when the *AMA Guides* treat the shoulder as part of the upper extremity. Since the evaluating physicians expressed their opinion in terms of "upper extremity," the employer and insurer argue that an injury to the shoulder should be treated as a scheduled injury to the arm.

We disagree. The Commission's adoption of the *AMA Guides* as the standard for the evaluation of permanent impairment does not affect § 9–627's classifications of permanent

---

**5.** Section 9–721 mandates that "[a] physician shall evaluate a permanent impairment and report the evaluation to the Commission in accordance with the regulations of the Commission."

partial disabilities. The legislative history of the *AMA Guides*' incorporation into Maryland law reveals that neither the General Assembly nor the Commission intended to incorporate the *AMA Guides*' definitions of body parts into the workers' compensation law of Maryland.

In the Acts of 1987, chapter 591, § 1, the General Assembly adopted the following provision, then codified as Art. 101, § 36C:

(a) *In general.*—On or before July 1, 1988, the Commission shall adopt guides to be used by physicians to measure and report to the Commission all medical evaluations of permanent impairments, including loss of function, endurance, and range of motion, and pain, weakness, and atrophy.

(b) *Nature of guides.*—The guides to be adopted by the Commission under subsection (a) of this section are regulations under Subtitle 1, Title 10 of the State Government Article.

(c) *Guides prior to adoption of official guide.*—On or after July 1, 1987, and until the Commission adopts guides under subsection (a) of this section, physicians shall use the most recent edition of the American Medical Association's "Guides to the Evaluation of Permanent Impairment," as amended, to measure all medical evaluations of permanent impairments. Physicians shall report their findings in accordance with those guides.

(d) *Additional information prior to official guide.*—Until the Commission adopts guides under subsection (a) of this section, a physician, in evaluating a permanent impairment, shall submit to the Commission additional information, including:

(1) Pain;

(2) Weakness;

(3) Atrophy;

(4) Loss of endurance; and

(5) Loss of function.

The Commission adopted guides as directed in § 36C(a); COMAR 14.09.04 went into effect December 15, 1988. Like the interim measure enacted by the General Assembly in Article 101, § 36C(c), the Commission also selected the *AMA Guides* as the method of evaluation that physicians shall use in assessing permanent impairment for workers' compensation purposes. COMAR 14.09.04 reads:

**.01 Incorporated Document.**

Those provisions of "Guides to the Evaluation of Permanent Impairment" (American Medical Association, 3rd ed.1988) specified in Regulation .02 are incorporated by reference.

**.02 General Guidelines.**

A. As evidence of permanent impairment, a party may submit a written evaluation of permanent impairment prepared by a physician.

B. When preparing an evaluation of permanent impairment, a physician shall:

(1) Generally conform the evaluation with the format set forth in § 2.2 ("Reports") of the American Medical Association's "Guides to the Evaluation of Permanent Impairment";

(2) Use the numerical ratings for the impairment set forth in the American Medical Association's "Guides to the Evaluation of Permanent Impairment", provided that a physician is not required to use the inclinometer evaluation technique specified in § 3.3, but instead may use the goniometer technique specified in the "Addendum to Chapter 3";

(3) Include the items listed under the heading "Comparison of the results of analysis with the impairment criteria ..." in § 2.2 ("Reports") of the American Medical Association's "Guides to the Evaluation of Permanent Impairment"; and

(4) Include information on the items required by Labor and Employment Article, § 9–721, Annotated Code of Maryland, which include:

(a) Loss of function, endurance, and range of motion, and

(b) Pain, weakness, and atrophy.

C. A physician preparing an evaluation of permanent impairment may include numerical ratings not set forth in the American Medical Association's "Guides to the Evaluation of Permanent Impairment" for the items listed in § B(4) of this regulation. If the physician does so, the physician shall include in the evaluation the detailed findings that support those numerical ratings.

D. When reviewing an evaluation for permanent impairment, the Commission shall consider all the items listed in § B of this regulation.

E. The Commission may not approve payment of a physician's fee for an evaluation that does not comply with this regulation.

F. This regulation shall apply to all evaluations prepared on or after July 1, 1990.

When the former Article 101 was revised and enacted as Title 9 of the Labor and Employment Article, the provision of § 36C that directed the Commission to adopt guides for medical evaluation of permanent disability and the provision that established an interim guide were deleted as obsolete because the Commission had adopted guides. 1991 Maryland Laws, ch. 8, at 946 (Revisor's Notes). Section 9–721, the successor to § 36C, provides:

(a) *In accordance with regulations.*—A physician shall evaluate a permanent impairment and report the evaluation to the Commission in accordance with the regulations of the Commission.

(b) *Contents of evaluation.*—A medical evaluation of a permanent impairment shall include information about:

(1) atrophy;

(2) pain;

(3) weakness; and

(4) loss of endurance, function, and range of motion.

As the legislative history illustrates, the General Assembly initially adopted the *AMA Guides* as an interim method of evaluation for use until the Commission adopted guides for permanent evaluation. The Commission then promulgated COMAR 14.09.04 which incorporates by reference certain provisions of the *AMA Guides*. Section 9–721, the current version of the statute governing evaluation of permanent impairment, mandates that physicians evaluate permanent impairment in accordance with the Commission's regulations and sets out certain types of information that must be included in the evaluation. *See Sears Roebuck v. Ralph*, 340 Md. 304, 313, 666 A.2d 1239, 1243 (1995) (discussing legislative history of § 9–721).

This legislative history does not reveal an intent on the part of the General Assembly to incorporate the terminology of the *AMA Guides*. In fact, the General Assembly adopted the *AMA Guides* solely as interim guides to be used until the Commission promulgated guides of its own. The provision of § 36C that referred to the *AMA Guides* was deleted as obsolete when § 36C was placed in Title 9 of the Labor and Employment Article. Maryland Laws 1991, ch. 8, at 946 (Revisor's Notes). The current version of § 9–721 does not mention the *AMA Guides*, but refers only generally to the Commission's regulations. We agree with the circuit court and Court of Special Appeals that " 'the plain meaning of the statute is devoid of any such intent' to 'enact the AMA's division of body parts.' "

Furthermore, COMAR 14.09.04.01 incorporates by reference only those provisions of the *AMA Guides* that are specified in COMAR 14.09.04.02; the Commission did not incorporate the entire *AMA Guides*. COMAR 14.09.04.02 does not refer to the *AMA Guides'* terminology, but rather requires that evaluating physicians employ the numerical ratings and the reporting format from the *AMA Guides*. Nowhere does the regulation mandate or suggest that the particular terminology used in the *AMA Guides* substantively changes workers' compensation law.

In summary, nothing in the statutes, regulation, nor in the *AMA Guides* disturbs § 9–627's division of injuries into those specifically listed and those "Other cases" addressed by § 9–627(k). Section 9–627 specifically lists loss of an arm, but it fails to mention loss of a shoulder. Incorporating portions of the *AMA Guides* in an administrative regulation cannot rewrite § 9–627. The circuit court did not err in affirming the Commission's award of permanent partial disability benefits based on § 9–627(k), "Other cases."

■ The employer and insurer also dispute the Commission's finding of permanent partial disability based on thirty percent industrial loss of use of the body. Although the employer and insurer maintain that the Commission may not classify claimant's injury as "Other cases" impairment under § 9–627(k), they contend that if the Commission may do so, it must at least convert upper extremity impairment ratings to the equivalent impairment of the body as a whole and award permanent partial disability based on that converted impairment rating. We agree, but conclude that the Commission's finding of thirty percent loss of use of the body was not error under these circumstances.

■ As we discussed above, the unscheduled "Other cases" category, to which Petitioner's injury belongs, requires the Commission to evaluate industrial loss of use of the whole body, not just loss of an isolated body part. The evaluating physicians in this case presented their evaluations in terms of impairment of the right upper extremity, not in terms of the body as a whole. The *AMA Guides* contain tables that convert impairment expressed in one form to impairment expressed in another form. Table 3 of Chapter 3 converts impairment of the upper extremity to impairment of the body as a whole. In this case, Dr. Novin's assessment of forty-one percent impairment of the right upper extremity translates to twenty-five percent impairment of the whole person; Dr. Lapidario's assessment of twenty-five percent impairment of the right upper extremity translates to twelve percent impairment of the whole person.

The employer and insurer contend that the Commission improperly took the average of the two upper extremity impairment ratings (forty-one percent and twenty percent) and then applied that average to the whole person rather than to the upper extremity, when instead the Commission should have taken the average of the whole body impairment ratings.

We reject their contention because no statute or regulation requires that the Commission take the average of the medical assessments, nor is the Commission bound by the highest or lowest medical assessments. *See Gly Construction Co. v. Davis,* 60 Md.App. 602, 607, 483 A.2d 1330, 1333 (1984), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985). In *Gly Construction,* Chief Judge Richard Gilbert, then Chief Judge of the Court of Special Appeals, writing for the court, considered whether the Commission may award a percentage of disability greater than the highest medical evidence in the record. *Id.* at 605, 483 A.2d at 1332. The intermediate appellate court held that nothing within the workers' compensation statute or accompanying regulations limits the Commission, or the circuit court on petition for judicial review, to the medical evaluations. *Id.* at 606, 483 A.2d at 1332.

Moreover, the Commission's determination of disability was never intended to be the one-to-one equivalent of the medical evaluations of the claimant's impairment. The Court of Special Appeals in *Gly* reiterated that injury and disability are not synonymous and that compensation is paid not for the injury but for the resulting disability. *Id.* at 607, 483 A.2d at 1333. Chief Judge Gilbert wrote:

To hold that in all cases the Commission or the court is compelled to find an amount of disability that is no greater than the highest medical evaluation and no less than the lowest medical evaluation would impermissibly shift the legal determination of "disability" to physicians. That result would be in clear contravention of the legislative intent and traditional role of the Commission or court.

*Id.,* 483 A.2d at 1333. The *AMA Guides* themselves warn that the impairment ratings derived from the *AMA Guides* are not substitutes for the legal determination of disability.

[A]s used in the *Guides,* "impairment" means an alteration of an individual's health status that is *assessed by medical means,* "disability," which is *assessed by nonmedical means,* means an alteration of an individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements.

\* \* \* \* \* \*

Each administrative or legal system that uses permanent impairment as a basis for disability rating needs to define its own process for translating knowledge of a medical condition into an estimate of the degree to which the individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements, is limited by the impairment. We encourage each system not to make a "one-to-one" translation of impairment to disability, in essence creating a use of the *Guides* which is not intended.

AMA GUIDES, *supra,* § 1.1, 1.3, at 2, 6 (emphasis in original). Were the Commission routinely to determine industrial loss of use by averaging the medical assessments, the Commission would fall short of its obligation to consider all of the factors set out in COMAR 14.09.04.02(B) to determine a claimant's disability.

■ The Commission must do more than merely adopt medical evaluations of anatomical impairment; the Commission must assess the extent of the loss of use by considering how the injury has affected the employee's ability to do his or her job. An evaluating physician provides the Commission with an assessment of medical impairment; the finder of fact, however, must determine the degree of disability. GILBERT & HUMPHREYS, *supra,* § 7.2, at 135. Medical impairment and compensable disability are not synonymous. In the treatise authored by Gilbert and Humphreys, we find a hypothetical that illustrates the difference between injury and compensable disability:

Consider, for example, claimants A and B, who have both sustained amputations on both hands of the thumbs. Claimant A is a freight checker, who is required to operate the push buttons on an electronic truck scale and tabulate weight sheets for his employer. After recovering from the injury he returns to this pre-accident duties and works the same number of hours per week. Claimant B is a concert pianist who, as a result of the injury, has been informed that he shall never play the piano professionally, if at all. Notwithstanding the similarity of the injuries, it is easy to fathom that Claimant B conceivably could be found permanently totally disabled, while Claimant A would receive an award for a much smaller industrial loss of use of the body. *Id.* § 7.5, at 141.

The Court of Special Appeals acknowledged that the Commission is not bound by the medical evaluations, but nevertheless held that the Commission committed an error of law when it concluded that Getson had sustained a thirty percent impairment of her body as a whole because "the Commission failed to abide by its own regulations." We are unable to discern how the Commission disregarded its own regulation. COMAR 14.09.04 sets out general guidelines for physician evaluations. The COMAR regulation only requires that the Commission consider the factors specified in COMAR 14.09.04.02(B) and that the Commission authorize payments only to physicians who comply with the regulation.

In this case, the Commission found a thirty percent loss of use of the body as a whole, seventeen percent greater than the highest medical assessment. COMAR 14.09.04.02 directs that the Commission, in assessing permanent impairment, shall consider all of the information provided in the medical evaluations, as well as the information required by § 9–721(b)—namely, atrophy, pain, weakness, and loss of endurance, function, and range of motion. § 9–721(b).

Dr. Novin concluded that Getson "has significant pain, weakness, loss of endurance, atrophy, and loss of function." Dr. Novin also found impaired range of motion. Dr. Lapidar-

io, who assessed a lower level of impairment, nonetheless concluded that Petitioner's injury resulted in "recurrent discomfort in the right shoulder, weakness of the muscles, stiffness of the shoulder joint and loss of endurance." Petitioner's testimony demonstrated that the injury has limited her day-to-day activities. She testified that her arm gets very tired and hurts when outstretched for a long period of time at work. She also reported that she has difficulty giving customers their money at work because the counter is too high for her to reach with her right arm and that she can no longer lift the change trays used at the bank. Outside of the work context, Petitioner experienced a great deal of pain in cold weather and suffered from such limited range of motion that getting items out of her cupboards at home and reaching her arm behind her back in order to dress herself have become nearly impossible.

Upon judicial review in the circuit court, the Commission's decision is presumed to be *prima facie* correct and the burden of proving that the Commission's decision was not correct rests with the party seeking judicial review. § 9–745(b). We agree with the circuit court that the employer and insurer did not overcome the presumption of correctness that the Commission's decision enjoys. We conclude that the circuit court did not err in affirming the Commission's finding of 30% loss of industrial use of the body as a whole.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.*