952 A.2d 294

George MALDONADO

v.

AMERICAN AIRLINES, et. al.

No. 135, Sept. Term, 2007.

Court of Appeals of Maryland.

July 25, 2008.

468

David E. Fink, Baltimore, for petitioner.

Joseph C. Tarpine, III (Mary M. Wiethorn of Semmes, Bowen & Semmes, on the brief), Baltimore, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ELDRIDGE (Retired, Specially Assigned), RAKER (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

In this workers' compensation case, the following question is presented:

Is expert medical testimony on the issue of physical impairment alone, sufficient to overcome the Workers' Compensation Commission's finding on the issue of "industrial loss[?]"

Phrased in another way, the issue is whether in a judicial review proceeding of a permanent partial disability award by the Workers' Compensation Commission, must the disputant provide the testimony of a vocational expert regarding industrial loss,[1] in order to rebut the presumption of correctness of the award?

In the present case, the Workers' Compensation Commission determined that George Maldonado, Petitioner, sustained a permanent partial disability of "50% under 'Other Cases' industrial loss of the body as a result of the injury to the back and psychiatric (serious disability)." Subsequently, a jury, in a judicial review proceeding,[2] reduced the percentage of loss to 35%, and the trial judge denied Maldonado's Motion for Judgment Notwithstanding the Verdict.

During the trial, the employer, American Airlines, and its insurer, Insurance Company of the State of Pennsylvania (hereinafter collectively referred to as "American Airlines"), Respondents, called Maldonado to the stand; he testified that

---

1.  Industrial loss is "the percentage by which the industrial use of the covered employee's body was impaired as a result of the accidental personal injury or occupational disease." Md.Code (1991, 1999 Repl. Vol.), § 9–627(k) of the Labor and Employment Article.

    Statutory references throughout are to the Labor and Employment Article, Maryland Code (1991, 1999 Repl.Vol.), unless otherwise noted.

2.  Section 9–737 of the Labor and Employment Article, Maryland Code (1991, 1999 Repl.Vol., 2006 Supp.) provides for judicial review of Commission decisions:

    An employer, covered employee, dependent of a covered employee, or any other interested person aggrieved by a decision of the Commission, including the Subsequent Injury Fund and the Uninsured Employers' Fund, may appeal from the decision of the Commission provided the appeal is filed within 30 days after the date of the mailing of the Commission's order by:
    (1) filing a petition for judicial review in accordance with Title 7 of the Maryland Rules;
    (2) attaching to or including in the petition a certificate of service verifying that on the date of the filing a copy of the petition has been sent by first class mail to the Commission and to each other party of record; and
    (3) on the date of the filing, serving copies of the petition by first class mail on the Commission and each other party of record.

he was forty-three years old and that at the time of his injury he was working as an American Airlines fleet service clerk, a position he occupied for fourteen and a half years, which consisted of "loading, offloading, deicing an aircraft, pushing the aircraft back when it was ready for departure, [and] giv[ing] hand signals to the aircraft when it was approaching the gate." Maldonado further testified that in the process of loading luggage into an aircraft, he cut his hand on an aircraft door; thereafter he proceeded to load baggage into an aircraft with one hand, at which point he felt a tear in his lower back. He testified that the back injury prohibited him from returning to work since the accident, but that after his injury he also obtained a bachelor's degree in theology in 2002, was able to drive a car, walk between 30 to 40 minutes without taking a break and do "light work" around the house. He indicated, nevertheless, that, because he could only sit for a certain period of time before needing to lay down, "no job is going to hire me."

American Airlines also presented the videotaped depositions of two medical experts, Dr. Stephen W. Siebert, a psychiatrist, and Dr. Edward R. Cohen, an orthopedic surgeon, who both testified as to their evaluation of Maldonado' s permanent impairment.[3] *See* Section 9–721. Dr. Siebert testified that

---

**3.** Permanent impairment evaluations do not involve treatment but are designed to quantify and qualify the physical and psychological changes that have occurred based upon the injury. *See* Steven Babitsky, James J. Mangraviti, Jr., Christopher R. Brigham, M.D. & Christopher J. Todd, *Understanding the AMA Guides in Workers' Compensation* § 2.2 (3d ed.2002) (describing the process of evaluating impairment). In Maryland the evaluation process is governed by Section 9–721 of the Labor and Employment Article, Maryland Code (1991, 1999 Repl.Vol., 2006 Supp.), which states:

(a) *In general.*—Except as provided in subsection (c) of this section, a physician shall evaluate a permanent impairment and report the evaluation to the Commission in accordance with the regulations of the Commission.

(b) *Contents of evaluation.*—A medical evaluation of a permanent impairment shall include information about:

(1) atrophy;

(2) pain;

(3) weakness; and

"based on impairments in [Maldonado's] daily activities, in [Maldonado's] social functioning, in [Maldonado' s] task completion and in what I feel would be [Maldonado's] likelihood to deteriorate or decompensate in a work situation, I assessed

(4) loss of endurance, function, and range of motion.
(c) *Impairments involving behavioral or mental disorders.*—If a permanent impairment involves a behavioral or mental disorder, a licensed psychologist or qualified physician shall:
(1) perform an evaluation of only the mental or behavioral portion of the permanent impairment; and
(2) report the evaluation to the Commission in accordance with the regulations of the Commission.
Atrophy refers to "[a] wasting of tissues, organs, or the entire body." *Stedman's Medical Dictionary* 178 (28th ed.2006).
COMAR 14.09.04.02 states:
A. As evidence of permanent impairment, a party may submit a written evaluation of permanent impairment prepared by a physician.
B. When preparing an evaluation of permanent impairment, a physician shall:
(1) Generally conform the evaluation with the format set forth in § 2.2 ("Reports") of the American Medical Association's "Guides to the Evaluation of Permanent Impairment";
(2) Use the numerical ratings for the impairment set forth in the American Medical Association's "Guides to the Evaluation of Permanent Impairment", provided that a physician is not required to use the inclinometer evaluation technique specified in § 3.3, but instead may use the goniometer technique specified in the "Addendum to Chapter 3";
(3) Include the items listed under the heading "Comparison of the results of analysis with the impairment criteria ..." in § 2.2 ("Reports") of the American Medical Association's "Guides to the Evaluation of Permanent Impairment"; and
(4) Include information on the items required by Labor and Employment Article, § 9–721, Annotated Code of Maryland, which include:
(a) Loss of function, endurance, and range of motion, and
(b) Pain, weakness, and atrophy.
C. A physician preparing an evaluation of permanent impairment may include numerical ratings not set forth in the American Medical Association's "Guides to the Evaluation of Permanent Impairment" for the items listed in § B(4) of this regulation. If the physician does so, the physician shall include in the evaluation the detailed findings that support those numerical ratings.
D. When reviewing an evaluation for permanent impairment, the Commission shall consider all the items listed in § B of this regulation.
E. The Commission may not approve payment of a physician's fee for an evaluation that does not comply with this regulation.
F. This regulation shall apply to all evaluations prepared on or after July 1, 1990.

[Maldonado] to have a mild overall impairment of about 10 percent," and attributed 5% of the impairment to be directly related to the accident and 5% to other factors. Dr. Cohen testified that Maldonado had a 10% impairment to his lower back because he believed half of the degenerative changes were preexisting and half were attributable to the accident; he further stated that his examination and Maldonado's complaints revealed "that [Maldonado] did not have any findings consistent with what we call a radiculopathy"[4] and that "there was no evidence of instability in [Maldonado's] spine."

After the denial of his motion for a directed verdict,[5] Maldonado offered the videotaped depositions of two experts, a psychologist, Dr. Morris Lasson, Ph.D, who testified that Maldonado suffered a 60% impairment, due to psychological problems arising from the injury, including depression, and Dr. Jeffrey D. Gaber, M.D., an internist who testified that he estimated Maldonado to have a 45% impairment due to a disk injury to his back as well as an additional 15% impairment from other problems associated with the accident. Maldonado again moved for a directed verdict at the close of all testimony, and the Judge reserved ruling. After being instructed and

4. Radiculopathy is defined as a "[d]isorder of the spinal nerve roots." *Stedman's Medical Dictionary* at 1622.

5. Maryland Rule 2–519, the Rule governing motions for directed verdict, states in pertinent part:

(a) **Generally.** A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.

(b) **Disposition.** When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

having deliberated, the jury reduced Maldonado's Commission award by 15%.[6] His Motion for Judgment Notwithstanding the Verdict pursuant to Maryland Rule 2–532,[7] based upon the absence of a vocational expert testifying on behalf of American Airlines, was denied.

On appeal to the Court of Special Appeals, and similarly before us, Maldonado requests a holding that any party who disputes a Commission decision under "Other cases" industrial loss must present the testimony of a vocational expert during a judicial review proceeding in order to rebut the presumption of correctness of a Commission award. After the Court of Special Appeals, in an unreported opinion, declined to so hold, we granted Maldonado's petition for certiorari, *Maldonado v. American Airlines*, 403 Md. 612, 943 A.2d 1244 (2008).

In his argument, Maldonado relies on *Jewel Tea Co. v. Blamble*, 227 Md. 1, 174 A.2d 764 (1961), and *Bullis School v. Justus*, 37 Md.App. 423, 377 A.2d 876 (1977), for the proposition that expert testimony is required to overturn a decision of the Commission when a complex issue, such as industrial loss, is involved. American Airlines counters Maldonado's assertion that vocational testimony is required by distinguishing *Jewel Tea Co.*, 227 Md. at 1, 174 A.2d at 764, and offering the reasoning in *Terumo Medical Corp. v. Greenway*, 171 Md. App. 617, 911 A.2d 888 (2006), to undermine Maldonado's interpretation of the earlier *Bullis School* Case from the

---

**6.** A 15% reduction equates to a diminution in the number of weeks for which Maldonado could recover for his injury based upon a cap of 500 weeks. A 50% permanent partial disability determination would equate to 250 weeks, while a 35 % determination would translate to 175 weeks, a 75 week difference. *See* Section 9–627(k). *See also Del Marr v. Montgomery County*, 397 Md. 308, 311, 916 A.2d 1002, 1003 (2007) ("[T]he Workers' Compensation Commission, using criteria set forth in § 9–627(k), must first determine the percentage by which the industrial use of the employee's body was impaired as a result of the accidental injury. It then must award compensation based on the proportion that the determined loss bears to 500 weeks, subject to an enhancement for serious disability under § 9–630, at the weekly rates set forth in §§ 9–628 through 9–630.").

**7.** Maryland Rule 2–532(a) provides for filing a Motion for JNOV "only on the grounds advanced in support" of the motion for directed verdict.

intermediate appellate court. American Airlines also contends that the evidence in the present case was sufficient for the jury to determine the degree of disability, relying on *Getson v. WM Bancorp,* 346 Md. 48, 694 A.2d 961 (1997), and that additional evidence need not be introduced, citing *General Motors Corp. v. Bark,* 79 Md.App. 68, 555 A.2d 542 (1989).

█ The Workers' Compensation Commission is empowered to grant awards of compensation for various levels of disability, including permanent partial disability.[8] Permanent partial disability awards are divided into two categories, scheduled injuries[9] and unscheduled "Other cases," under

---

8. A permanent partial disability is one that is " 'partial in character but permanent in quality.' " Richard P. Gilbert & Robert L. Humphreys, Jr., *Maryland Worker's Compensation Handbook* § 9.03[3] (3d ed.2007).

9. Compensation for scheduled injuries is set forth in Section 9–627(b)–(j):

(b) *Loss of a thumb, finger, or great toe.*—Compensation shall be paid for the period listed for the loss of the following:
(1) a thumb, 100 weeks;
(2) a 1st finger, commonly called the index finger, 40 weeks;
(3) a 2nd finger, 35 weeks;
(4) a 3rd finger, 30 weeks;
(5) a 4th finger, commonly called the little finger, 25 weeks; and
(6) a great toe, 40 weeks.
(c) *Loss and loss of use of phalanxes and digits.*—(1) Compensation for the loss of more than 1 phalanx of a digit of a hand or foot shall be the same as the compensation for the loss of the entire digit.
(2) Compensation for the loss of the 1st phalanx of a digit shall be 50% of the compensation for the loss of the entire digit.
(3) Compensation for the loss or loss of use of 2 or more digits or 1 or more phalanxes of 2 or more digits of a hand or foot:
(i) may be apportioned to the loss of use of the hand or foot caused by the loss or loss of use of the digits or phalanxes; but
(ii) may not exceed the compensation for the loss of a hand or (continued . . .) foot.
(d) *Loss of other toes, hand, arm, foot, leg, eye, hearing, or septum.*—
(1) Compensation shall be paid for the period listed for the loss of the following:
(i) 1 of the toes other than the great toe, 10 weeks;
(ii) a hand, 250 weeks;
(iii) an arm, 300 weeks;
(iv) a foot, 250 weeks;
(iv) a leg, 300 weeks; and
(v) an eye, 250 weeks.

(2) Compensation shall be paid for the period listed for:

(i) the total loss of hearing of 1 ear, 125 weeks; and

(ii) the total loss of hearing of both ears, 250 weeks.

(3) Compensation shall be paid for a perforated nasal septum for 20 weeks.

(e) *Permanent loss of use of hand, arm, foot, leg, or eye.*—The permanent loss of use of a hand, arm, foot, leg, or eye shall be considered equivalent to the loss of the hand, arm, foot, leg, or eye.

(f) *Partial loss of vision.*—(1) When a covered employee has a partial loss of vision in 1 or both eyes, compensation shall be paid that bears the same ratio to compensation for a total loss of vision that the partial loss of vision bears to the total loss of vision.

(2) In determining the percentage of vision lost, consideration may not be given to the effect that a correcting lens may have on the eye.

(g) *Amputation.*—(1) An amputation at or above the wrist or ankle may be apportioned to the loss of the use of the arm or leg, but may not be less than the compensation for the loss or loss of use of a hand or foot.

(2) Amputation at or above the elbow shall be considered the loss of an arm.

(3) Amputation at or above the knee shall be considered the loss of a leg.

(h) *Amputation or loss of use of part of member of body.*—When there has been an amputation or the loss of use of a part of any member of the body listed in this section for which compensation is not specifically provided in this section, the Commission shall award compensation for the proportion of the total number of weeks allowed for the amputation or loss of use of the entire member that the amputated or affected portion bears to the entire member.

(i) *Mutilations and disfigurements.*—(1) For mutilations and disfigurements not provided for in this section, the Commission may award compensation for up to 156 weeks.

(2) In making an award under paragraph (1) of this subsection, the Commission shall consider the character of the mutilation or disfigurement as compared with mutilation and disfigurement specifically provided for in this section.

(j) *Industrial loss.*—Compensation for less than 75 weeks.—(1) When compensation is awarded for less than 75 weeks for a disability listed in subsection (b) of this section, the Commission may determine that the disability results in an industrial loss by considering factors including:

(i) the nature of the physical disability; and

(ii) the age, experience, occupation, and training of the employee when the accidental personal injury or occupational disease occurred.

(2) If the Commission determines that the accidental personal injury or occupational disease results in industrial loss, the Commission may award the covered employee additional weeks of compensation not to exceed a total disability of 75 weeks.

which compensation for industrial loss [10] is determined by the tenets of Section 9–627(k):

(k) *Other cases.*—(1) In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the industrial use of the covered employee's body was impaired as a result of the accidental personal injury or occupational disease.

(2) In making a determination under paragraph (1) of this subsection, the Commission shall consider factors including:

(i) the nature of the physical disability; and the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred.

(3) The Commission shall award compensation to the covered employee in the proportion that the determined loss bears to 500 weeks.

(4) Compensation shall be paid to the covered employee at the rates listed for the period in §§ 9–628 through 9–630 of this Part IV of this subtitle.

Both Maldonado and American Airlines agree that the essence of the issue before us is whether expert vocational testimony on industrial loss is necessary to rebut the presumption of correctness of a workers' compensation award under Section 9–745(b), which states that in judicial review proceedings:

(1) the decision of the Commission is presumed to be prima facie correct; and

(2) the party challenging the decision has the burden of proof.

---

**10.** To assess industrial loss, the finder of fact looks to "the extent of the loss of use by considering how the injury has affected the employee's ability to do his or her job." *Getson v. WM Bancorp,* 346 Md. 48, 62, 694 A.2d 961, 968 (1997). *See also Giant Food Inc. v. Coffey,* 52 Md.App. 572, 578, 451 A.2d 151, 155 (1982) (stating that a finding of industrial loss "is equivalent to a finding of loss of earning capacity").

*See Baltimore County v. Kelly,* 391 Md. 64, 75–76, 891 A.2d 1103, 1109–10 (2006); *Ackerhalt v. Hanline Bros., Inc.,* 253 Md. 13, 20, 252 A.2d 1, 5 (1969); *Krell v. Md. Drydock Co.,* 184 Md. 428, 435, 41 A.2d 502, 505 (1945).

■ Section 9–745 does not require nor suggest any quantum or type of evidence to overcome the presumption of correctness of a workers' compensation award. This Court in addressing the burden of proof in a judicial review proceeding of such awards often has iterated that a party challenging the decision need not provide evidence additional to that provided before the Commission to satisfy the burden of proof. *Ackerhalt,* 253 Md. at 21, 252 A.2d at 5; *Abell v. Albert F. Goetze, Inc.,* 245 Md. 433, 437, 226 A.2d 253, 256 (1967); *Greenwalt v. Brauns Bldg. Specialties Corp.,* 203 Md. 313, 317–18, 100 A.2d 804, 806–07 (1953). Rather, as Judge Thomas B. Finan, writing for this Court in *Abell,* 245 Md. at 437, 226 A.2d at 256, explained, a party challenging the decision can overcome the presumption of correctness of a Commission decision "by submitting new evidence, by relying on all or a part of the record before the Commission, by argument as to the probative value of the evidence and by argument as to the credibility of witnesses." *See also Ackerhalt,* 253 Md. at 21, 252 A.2d at 5, and *Williams Constr. Co. v. Bohlen,* 189 Md. 576, 580, 56 A.2d 694, 696 (1948), in which we said:

> [W]here the Commission has considered conflicting evidence of essential facts, and has drawn one of two different permissible inferences, there may be imposed upon the party attacking the decision of the Commission merely a burden of persuasion, and not necessarily a burden of additional proof. . . . The provision of the Act placing the burden of proof upon the appellant means only that he must prove in the trial Court what he asserts. His burden is to convince the Court or the jury that the Commission decided incorrectly in interpreting the facts, or deducing the inference from the facts, or construing the law applicable to the facts.

■ The gravamen of Maldonado's argument is that there is a *per se* requirement for expert vocational testimony in a judicial review proceeding in order to rebut the presumption of correctness of a Commission decision on industrial loss, because industrial loss is such an inherently complicated issue, citing *Jewel Tea Co.*, 227 Md. at 1, 174 A.2d at 764. In *Jewel Tea Co.*, both parties sought judicial review of a Workmen's Compensation Commission decision that determined the employee was permanently totally disabled, with 60% of the disability being attributed to a work injury and 40% being the result of a pre-existing condition. The lay testimony provided by the employee supported the conclusion that she was permanently totally disabled; all medical testimony presented, including the testimony of the employee's own medical expert, conflicted with a finding of permanent total disability. We held, with respect to the lay testimony, that "lay testimony alone is not justified when the medical question involved is a *complicated* one, involving fact finding which properly falls within the province of medical experts," but clearly posited that such a statement "should not be taken as indicating that we conclude that all awards in cases of injuries of a subjective nature can stand only if accompanied by definitive medical testimony." *Id.* at 7, 174 A.2d at 767 (emphasis added). We, therefore, explicitly stated that we were *not* establishing a *per se* requirement for expert testimony when a medical question was involved. *Id.*

So, we note, has the Court of Special Appeals in *Terumo Medical Corp. v. Greenway*, 171 Md.App. at 617, 911 A.2d at 888, when addressing whether in *Bullis School*, 37 Md.App. at 423, 377 A.2d at 876, that court had embraced a *per se* requirement for vocational expert testimony. Judge Charles E. Moylan, Jr., writing for the intermediate appellate court in *Terumo Medical Corp.*, specifically repudiated any notion that vocational expert testimony was required under *Bullis School*:

> In *Bullis School*, of course, we said no such thing. We held that testimony from a vocational expert was admissible. That was it. We did not have before us and we did not discuss any minimal requirements for taking a case of

permanent total disability to the jury. We did not elevate vocational analysis to a *sine qua non* for a finding of permanent total disability.

*Terumo Med. Corp.*, 171 Md.App. at 639, 911 A.2d at 900.

The notion, delineated in *Jewel Tea Co.* and *Terumo Medical Corp.*, that expert testimony may be admitted to assist the fact-finder, is reflected in Maryland Rule 5–702, which states:

> Expert testimony *may* be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

(emphasis added). Obviously, the fact that expert testimony may be admissible, however, is not dispositive of the issue regarding whether it is required.

Whether, as Maldonado asserts, expert vocational testimony is *per se* required in every case depends upon whether the factors identified in Section 9–627(k)(2) are so complicated that no jury in any case, regardless of the other evidence presented, would have sufficient evidence upon which to alter a Commission decision without the expert testimony. The factors in Section 9–627(k)(2) include: "(i) the nature of the physical disability; and (ii) the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred." We have acknowledged that the first factor, "the nature of the physical disability," with respect to impairment only, in some cases may necessitate medical testimony of impairment to assist the finder of fact, *see Getson*, 346 Md. at 62, 694 A.2d at 968 (noting that often evaluating physicians provide "an assessment of medical impairment" to assist the finder of fact in determining the degree of disability), while never mandating a

*sine qua non* requirement. The other factors to be considered under Section 9–627(k)(2), "the age, experience, occupation, and training" of the employee when the accident occurred, moreover, are not so complicated as to require in every case expert vocational testimony to assist the jury in its fact-finding, for as Judge Sally D. Adkins, writing for the Court of Special Appeals in this case, aptly noted, "jurors are generally acquainted with matters involving work, vocation, age, experience, training, abilities, salary, and job prospects."

Our conclusion that expert vocational testimony is not *per se* required to determine industrial loss is consistent with cases in our sister jurisdictions in which their courts have had occasion to review workers' compensation awards. In those cases, no court has determined that expert vocational testimony was a *sine qua non* for determining industrial loss. *See Ex parte Northam*, 689 So.2d 854, 857 (Ala.1996) (holding that "while medical testimony as to an employee's degree of impairment is probative, as is the testimony of a vocational expert, it is well settled that neither is required" to make a finding of 60% permanent partial disability); *Bennett v. Clark Hereford Ranch*, 106 Idaho 438, 680 P.2d 539, 543 (1984) (iterating that while " 'an expert in the area of employment' " often testifies to prove that the percentage of disability exceeds the percentage of medical impairment, such expert testimony is not required); *Copeland v. Johnson Group, Inc.*, 24 Kan.App.2d 306, 944 P.2d 179, 187 (1997) (rejecting the contention that the "extent of permanent partial general disability should be made by a vocational rehabilitation expert"); *Haney v. Aaron Ferer & Sons, Co.*, 3 Neb.App. 14, 521 N.W.2d 77, 83 (1994) (declaring that the trial court "did not need the expert testimony of a vocational rehabilitation counselor to determine earning capacity loss" of 25%); *Bituminous Cas. Co. v. Dep't of Indus., Labor and Human Relations*, 97 Wis.2d 730, 295 N.W.2d 183, 187 (1980) (holding that the prediction of loss of earning capacity "need not be presented by an employment expert; a qualified physician and even the department itself can determine the percentage of such disability"). Significantly, even states that purport to require

expert vocational testimony do not have a *per se* rule that requires such testimony in every case. *See Brown v. Workers' Comp. Appeal Bd. (Knight Ridder, Inc./Phila. Newspapers, Inc.)*, 856 A.2d 302, 305–06 (Pa.Cmwlth.2004) (stating that although the statute dictates that earning power "shall be based upon expert opinion evidence," "[e]xpert reports are not necessary in situations ... to prove earning power in an amount shown by credible evidence to have been received"); *Caldwell v. John Morrell & Co.*, 489 N.W.2d 353, 362 (S.D. 1992) (acknowledging that while there is a "general rule" that testimony of a vocational expert is required, "there may be cases where an expert's testimony on loss of use, over and above a medical impairment, may be only advisable rather than essential").

We, therefore, conclude that the testimony of a vocational expert is not a *sine qua non* requirement to rebut the presumption of correctness of a Workers' Compensation Commission award of permanent partial disability under "Other cases" industrial loss, nor is expert vocational testimony required in this case, where the jury was presented with sufficient evidence from which to determine industrial loss. Specifically, in terms of the statutory factors listed in Section 9–627(k)(ii), the age, experience, occupation and training of the employee when the accident occurred, Maldonado testified that he was forty-three years old, that at the time of the accident he had been working for American Airlines as a fleet service clerk for fourteen and a half years, that the position required loading, offloading and deicing the plane as well as "pushing the aircraft back when it was ready for departure, [and] giv[ing] hand signals to the aircraft when it was approaching the gate."

■ There was also adequate evidence upon which the jury could gauge the nature of the physical disability pursuant to Section 9–627(k)(i). The jury heard conflicting testimony from the doctors for each party as to the extent of the Maldonado's back injury as well as psychological functioning related to the accident. Maldonado himself also provided the jury with

evidence relevant to this factor;  he testified that after sustaining his injuries, he obtained a bachelor's degree in 2002 and that he was able to drive a car, walk between 30 to 40 minutes without taking a break and engage in "light work" around the house, but that because he could only sit for a certain period of time before needing to lay down "no job is going to hire me."  Based on the testimony of the witnesses, including Maldonado, there was sufficient evidence provided on each statutory factor to allow the jury to "assess the extent of the loss of use by considering how the injury has affected the employee's ability to do his or her job."  *Getson*, 346 Md. at 62, 694 A.2d at 968.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS IN THIS COURT TO BE PAID BY PETITIONER.**